UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SAMI BAGHDADY,                    :

                Plaintiff,        :

v.                               :        No. 3:05-cv-1494 (AHN)

GEORGE BAGHDADY, et al.,          :

                Defendants.       :

<u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

This is a lawsuit between two brothers regarding an alleged
business partnership.  The plaintiff Sami Baghdady ("Sami") sued
his brother George Baghdady ("George"), George's wife, Sylvia
Baghdady ("Sylvia"), the Baghdady Qualified Personal Residence
Trust, and the Baghdady Limited Partnership (collectively,
"defendants"), alleging breach of a partnership agreement, unjust
enrichment, breach of fiduciary duty, misrepresentation, and
civil theft.  He also seeks an accounting and a liquidation of
the partnership.  Presently before the court is the defendants'
motion for summary judgment [doc. # 164].  For the reasons that
follow, the defendants' motion for summary judgment is granted in
part and denied in part.

FACTS

The following facts are not in dispute.[1]  The parties agree

_____

[1] The court notes that the parties had difficulty stating
any facts that were not disputed.  However, parties cannot create
genuine issues of material facts simply by making conclusory
allegations.  <u>See</u> <u>Delaware & Hudson Ry. Co. v. Conrail</u>, 902 F.2d
174, 178 (2d Cir. 1990).

there was a partnership from approximately 1958 to 1970.[2]  The
partnership owned a business that eventually was called the Mary
Carter Paints and Garden Center,[3] and operated from a building on
Barnum Avenue in Stratford, Connecticut.[4]  The business grew over
the years to include several other locations.

In 1969, George and his wife Sylvia bought 104 Elm Street,
Monroe, Connecticut, which consists of approximately 6 acres and
a house, as joint tenants with right of survivorship.

On December 24, 1970, George sent a letter to Sami in which
he outlined sums of money that Sami had received from the
partnership business from 1958 to 1970, and stated that "this
business is in the hole for ten thousand dollars for me, plus
what I had to do in terms of dollars and cents and effort."
George stated "Sam this is a list of what you have received in
money . . ."

---

[2] Sami alleges that the partnership did not begin until 1960,
but several documents and letters introduced as evidence in this
case reflect a date of 1958 or 1959 (Pl.'s Compl. ¶¶ 27, 33(a),
33(b), 39).  The parties dispute whether a partnership existed
after 1970.

[3] The business started out as a paint store; the garden
center was added later.

[4] There is a dispute as to whether Sami owned the building or
the brothers owned the building together.

```
1958-1966                  31,000 (round figure)
1967                       2,700
1968                       2,400
1969                       1,400
plus                       1,300
plus your car expenses
for 12 years               6,000
                          _____
                           51,800
```

Sami admits that he received the letter and has kept it for the last 38 years. Sami states that what is contained in the letter is wrong and he does not agree with it. George produced a book during this lawsuit that he called a "Daribi Book," in which he had written amounts of money that he allegedly distributed to himself and to Sami from 1958 to 1970. In response to George's letter, Sami claims he wrote a letter to George on December 30, 1970, in which he made statements concerning the alleged partnership agreement.

In approximately 1971, Sami sold or transferred his interest in the Paint Center to George. Sami stated in another, unrelated lawsuit that, as of December 1971, he had no ownership interests in any other entities except for his real estate development company, Cedar Crest Construction. He also testified in that lawsuit that he owned no property aside from certain parcels in Massachusetts.

In 1973, Sami and George signed a lease agreement with James Shevlin for the Barnum Avenue Building. The leased premises consisted of the Mary Carter Paint Store, Mary Carter Garden Center and accompanying office spaces in the building. In 1978,

Sami deeded his interest in the Barnum Avenue Building to George.

In 1982, the State of Connecticut commenced an eminent domain proceeding on a portion of 104 Elm Street and in connection with the taking, George and Sylvia received a substantial amount of money. Sami was aware of the partial taking of the 104 Elm Street Property at the time it occurred, but did not receive any documents relating to the transaction.

In 1973, George and Sylvia purchased property at 7090 Main Street in Trumbull, Connecticut ("Main Street") and an existing business on the property called Pond Spring Nurseries ("Pond Spring").[5] George has managed Pond Spring since that time. Sami was aware of this purchase at the time it occurred, but did not receive closing documents. From 1973 to the present, Pond Spring has been registered as a sole proprietorship and has been reported every year since on George and Sylvia's joint income tax return on Schedule C.

In 1991, George and Sylvia transferred the 104 Elm Street property to a Qualified Personal Residence Trust and the Main Street property to a Family Limited Partnership. Sami considered these property transfers to be a breach of the partnership

---

[5] George and Sylvia also are listed as owners in fee simple of property at 94 Elm Street, which consists of approximately 2 acres. Sami did not refer to this property in his complaint or in any testimony about partnership properties. The damage analysis performed by Sami's expert also did not refer to the 94 Elm Street property. The court therefore declines to address the property's relevance to this case.

4

agreement.  Sami learned of the transfers from the brothers'
attorney, Larry Ganim, in approximately 1998 or 1999.  He also
had knowledge of these transfers from a title search he performed
on the properties in March 2000.  Sami acknowledges that he has
no agreement whatsoever with Sylvia, the Qualified Personal
Residence Trust or the Baghdady Limited Partnership, and that he
never advised these parties of his alleged interest in the
properties.

In November 1996, Sami wrote a letter to George in which he
stated that "it is clear to me that you are playing a major role
in the conspiracy of destroying my credibility and character" and
"you planted doubt in [Georgette's] mind that I have been abusing
her."[6]  At the end of the letter, Sami stated:

> At the time I did not know what you were insinuating or
> trying to accomplish other than creating distrust and
> hatred among family members.  Coming from an older
> brother it is a shameful act that does not allow
> forgiveness.  George, you have indeed succeeded in
> destroying the beautiful family that Mama LuLu spent
> her life building.  May God and Mama's soul forgive you
> for what you have done.

That same year, George did not provide any financial information
for Pond Spring Nurseries to Sami, nor for any years thereafter.

In 1997, George filed suit against Sami regarding property
the brothers and other family members owned in Lebanon.  Sami
stated that before and during the lawsuit, George assured him
that his interests in the oral partnership were "protected."

---

[6] Georgette is Sami and George's sister.

In June 2001, Sami wrote a letter to George demanding that the partnership be dissolved. In July 2004, Sami filed this suit against George, for, among other things, breach of the partnership agreement.[7] After the case was removed to federal court, Sami amended his complaint to allege additional claims of civil theft and unjust enrichment.

Sami now claims that he is entitled to his share of the partnership profits up to 1970, but concedes that from 1971-2001 George managed the business and the alleged partnership assets and thus was entitled to retain 100 percent of the partnership profits.[8] Sami maintains that the brothers did not share profits or retained earnings during this time and that George was responsible for paying all taxes on behalf of the partnership from 1971 to the present. Sami also claims he is entitled to a credit for the taxes he paid on behalf of the partnership before 1971. Sami further alleges that George's salary was set at "$9,000 per year plus an increase for the years from 1971 forward based on increased sales and profitability plus all profits from the business."

As the alleged partnership stands today, Sami claims a 50

_____

[7] Sami also sued Sylvia Baghdady, the Qualified Personal Residence Trust and the Baghdady Limited Partnership as owners of partnership assets.

[8] At the beginning of this lawsuit, Sami stated that both his and George's profits from the partnership were to be maintained in a bank account and deposited yearly. (Def.'s Ex. O at 108-09, 215-16, 238-39, 273-74; Pl.'s 56(a)2 Statement at ¶ 28.)

percent interest in the partnership business, as well as 50 percent of the 104 Elm Street and Main Street properties. Sami also claims he is entitled to 50 percent of "retained earnings" that was invested into the business, and to 50 percent of the rent collected on the Barnum Avenue Building from 1959-1978. Sami also seeks the value of half of the Mary Carter Garden Store inventory at the end of 1970.

Sami claims that he allowed George and Sylvia to hold title to the 104 Elm Street and Main Street properties in their names for their "convenience" and so that George would be able to "leverage and borrow on good pieces of properties . . ." but that he and George's partnership were the actual owners of the property. Sami also claims that every time George borrowed against the property in the form of a mortgage, he breached the partnership agreement. Sami has also claimed at various times in this action that he contributed either $13,500, $12,500 or $7,500 toward the purchase of the 104 Elm Street property. Sami now adopts $7,500 as the accurate amount of his contribution. He further alleges that any other funds used to maintain or purchase both properties were partnership funds.

Sami's damages expert stated that his analysis is correct if the numbers Sami furnished to him are correct. Sami has stated that he does not know what his damages are or how to calculate them.

Summary judgment should be granted if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and all ambiguities and inferences that may reasonably be drawn from the facts must be viewed in the light most favorable to the nonmoving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. A disputed issue is not created by a mere allegation in the pleadings, Applegate v. Top Assoc., Inc., 425 F.2d 92, 96 (2d Cir. 1970), or by surmise or conjecture, Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Conclusory assertions also do not create a genuine factual issue. Delaware & Hudson Ry. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the nonmoving party's case." Nora Beverages, Inc. v. Perrier Group of Am.,

<u>Inc.</u>, 164 F.3d 736, 742 (2d Cir. 1998).

DISCUSSION

Sami claims that he formed a business partnership with his brother George that consisted of the Mary Carter Paint and Garden Center, later expanded to include Pond Spring and encompassed the Main Street and 104 Elm Street property. Sami alleges that he provided the start-up money for the partnership business and George was to run the partnership, and that the partnership continued until 2001. The defendants counter that there was no partnership agreement between the brothers after 1970. The defendants contend that Sami has no proof of an ongoing partnership; but if there was a partnership, Sami knew of George's alleged breaches years ago and thus the relevant statutes of limitations have run on all of Sami's claims.

I.  <u>Existence of the Partnership and Conn. Gen. Stat.
    § 34-339(b) & (c)</u>

Sami urges this court to find that a partnership existed between him and George until the date of his 2001 letter seeking its dissolution. However, whether a partnership exists is a question of fact for a jury to decide. <u>See</u> <u>Lenoble v. Best Temps, Inc.</u>, 352 F. Supp. 2d 237, 250 (D. Conn. 2005) ("the determination whether a partnership exists under the evidence and the inferences reasonably drawn from the evidence, is a question of fact for the jury"). Indeed, a jury must determine when the alleged partnership was formed, when it ended, and the amount of

9

the partners' contributions.  If a partnership is found to exist, the court determines how the dissolution and winding-up process should proceed.  <u>See</u> Conn. Gen. Stat. § 34-378.  Nonetheless, the court will assume for the purpose of the pending motion that the partnership alleged by Sami did exist.

The defendants argue that even if a partnership existed for the last 40 years, Sami's claims are all time-barred.  They base their argument primarily on Conn. Gen. Stat. § 34-339 (b) & (c), which provide:

> (b) A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business . . . .
>
> (c) The accrual of, and any time limitation on, a right of action for a remedy under this section is governed by other law.  A right to an accounting upon a dissolution and winding up does not revive a claim barred by law.

Conn. Gen. Stat. § 34-339 (b) & (c).  These statutes abolish the common law rule that all claims during a partnership could be brought only on an action for an accounting during the dissolution and winding-up process.  <u>See</u> Comment, Uniform Partnership Act § 405 n.4 (noting that the effect of § 405 is "to compel partners to litigate their claims during the life of the partnership or risk losing them.")

Sami argues that his claims arose only upon his demand in his June 6, 2001 letter to George that the partnership be dissolved.  Sami cites <u>Sagers v. Lee County Bank</u>, 1 Conn. App.

535, 539 (1984) and <u>Cole v. Fowler</u>, 68 Conn. 450, 457 (1896) in support of his argument. However, these cases reflect the old common law rule which was specifically rejected by the Revised Uniform Partnership Act ("RUPA") and, in turn, by the Connecticut legislature when it adopted the Act in 1996.[9] Indeed, both <u>Cole</u> and <u>Lee</u> were decided before the enactment of Conn. Gen. Stat. § 34-339 and do not govern the court's analysis.

The parties and the court note that there are currently no Connecticut cases that have analyzed Conn. Gen. Stat. § 34-339. However, the language of the statute was adopted verbatim from § 405 of RUPA, which other states also adopted. In Delaware, one court stated with respect to this statute: "Thus, it is clear under RUPA that a right of action arising during the life of a partnership is not revived merely because a dissolution occurs and a separate right to an accounting on dissolution arises." <u>Fike v. Ruger</u>, 754 A.2d 254, 264 (Del. Ch. 1999), aff'd 752 A.2d

---

[9] The court provided the parties with an opportunity to address specifically the effect of Conn. Gen. Stat. § 34-339 on the claims on this case. Sami stated that, though the statute applies to this case, it has no effect on his claims. Pursuant to Conn. Gen. Stat. § 34-398, sections 34-300 to 34-399 (Revised Partnership Act) only apply to partnerships formed before July 1, 1997 if the partnership voluntarily elects to be governed by those sections. Here, both parties have asserted that these sections apply to this case. Indeed, Sami relies specifically on Conn. Gen. Stat. § 34-398 in support of his argument that these sections govern the alleged partnership. (Pl.'s Mem. in Opp. 13). Sami also cites to Conn Gen. Stat. §§ 34-301, 34-316, 34-355, 34-372, and 34-378 in support of his arguments. Accordingly, the court finds that the two alleged partners have elected to have their alleged partnership governed by these sections.

112 (Del. 2000). Another Delaware case explained the policy behind the statute as it related to a recoupment defense asserted by a defendant in a partnership dissolution:

> Put simply, it makes little sense as a matter of policy
> . . . to permit a party to sit on its contractual
> rights and wait until dissolution to assert its claims.
> By that time, much of the evidence pertinent to those
> claims, such as testimony of employees involved in the
> relevant events who have long-since left the
> enterprise, might be unavailable or less reliable, and
> the plaintiff might be unable to mount a successful
> defense. Moreover, when a significant amount of time
> passes after a dispute arises and no claim is ever
> filed against a party, that party tends to assume that
> the dispute has been laid to rest.

TIFD v. Fruehauf, 883 A.2d 854, 866 (Del. Ch. 2004). In Connecticut, when the court considers the meaning of a statute, it must analyze it according to Connecticut's "plain meaning rule":

> The meaning of a statute shall, in the first instance,
> be ascertained from the text of the statute itself and
> its relationship to other statutes. If, after
> examining such text and considering such relationship,
> the meaning of such text is plain and unambiguous and
> does not yield absurd or unworkable results,
> extratextual evidence of the meaning of the statute
> shall not be considered.

Conn. Gen. Stat. § 1-2z. The plain language of Conn. Gen. Stat. § 34-339 indicates that Sami's argument that it was unnecessary for him to bring his claims within each claim's specific statute of limitations is unfounded. "Summary judgment may be granted where the claim is barred by the statute of limitations," Doty v. Mucci, 238 Conn. 800, 806 (1995), as long as the "material facts concerning the statute of limitations are not in dispute," Burns

12

v. Hartford Hosp., 192 Conn. 451, 452 (1984).  Accordingly, the court analyzes all of Sami's claims in light of the statute.

    II.  Civil Theft

    Sami alleges that, beginning sometime in the 1960s, George withheld money from the partnership's bank account and chronicled these sums in a ledger he called a "Daribi book."[10]  In the Daribi book, George listed certain sums of money that he retained for himself and a portion that he purportedly distributed to Sami.  Sami claims that he never received any of the money chronicled in the Daribi book and that George therefore committed civil theft in violation of Connecticut General Statutes § 52-563.  Sami further argues that George had a fiduciary duty to disclose such material facts to him and his fraudulent concealment of the theft tolled the statute of limitations.  The court disagrees.

    The Connecticut Supreme Court has held that civil theft is comprised of the same elements as larceny under Conn. Gen. Stat. § 53a-119.  Hi-Ho Tower v. Con-Tronics, Inc., 255 Conn. 20, 44 (2000).  "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."  Conn. Gen. Stat. § 53a-119.  Civil

---

[10] The parties cannot agree to the meaning of the word "Daribi."  George alleges that it means "tax" in Arabic; Sami alleges that it means "money" or "funds."

13

theft is regarded as a tort and is governed by the general tort statute of limitations, § 52-577, which provides that no tort action "shall be brought but within three years from the act or omission complained of." This statute has been defined as an "occurrence statute" which means "that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs." Collum v. Chapin, 40 Conn. App. 449, 451 (1996). If a party fraudulently conceals the existence of an action, the statute of limitations is tolled until the plaintiff discovers the injury. See Conn. Gen. Stat. § 52-595 ("If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.").

The parties do not dispute that George sent a letter to Sami in December 1970, in which he detailed certain sums of money that he had given to Sami, Sami acknowledges that he received the letter, and maintains that he knew it was incorrect from the moment he read it because he had never received the amounts of money listed.[11] Therefore, upon receipt of that letter, Sami had

---

[11] The court notes that, not only did Sami receive the letter in 1970, he also kept the original letter for the past 38 years and produced it during the course of the lawsuit.

actual knowledge that George was withholding certain sums of money from the partnership, and to preserve his claim to recover that money, he had a duty to take steps to recover it.  Even if there was a fiduciary relationship between the parties,[12] George affirmatively disclosed sufficient information to Sami so that he should have been aware of a potential claim against George. Indeed, even when a fiduciary relationship exists between the parties, as alleged here, it is the plaintiff's burden to demonstrate his ignorance of the facts -- "there plainly can be no effective tolling for a plaintiff who was aware of the existence of his or her cause of action from the time the claim originally accrued."  Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 427-28 (2d Cir. 1999).  Though Sami may not have had access to the full details of all of the sums that George was withholding from the partnership bank account, "the statutory period . . . (does) not await appellant's leisurely discovery of the full details of the alleged scheme."

---

[12] There is no automatic fiduciary relationship between business partners, and "it is well settled that a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other."  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 38 (2000) (citations and internal quotation marks omitted).  The Connecticut Supreme Court has "refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations." Id. (citing Harper v. Adametz, 142 Conn. 218, 225 (1955)).  Viewing the evidence in a light most favorable to the nonmoving party, the court assumes without deciding that a fiduciary relationship existed.

Long v. Abbott Mortgage Corp., 459 F. Supp. 108, 121 (D. Conn. 1978)(citing Klein v. Bower, 421 F.2d 338, 343 (2d Cir. 1970)). The statute began to run at the time Sami received the letter and thought that its contents were false or fraudulent and he should have brought his claim of civil theft before December 1973. Instead, he failed to do anything to preserve his rights for the last three decades, and his claim now is barred by the statute of limitations.

In addition, even if Sami's claim was not barred by the statute of limitations, it is barred by the doctrine of laches. Under Connecticut law, laches applies to a party's claim if it has engaged in unreasonable delay and if the delay has prejudiced the party against whom such relief is sought. Papcun v. Papcun, 181 Conn. 618, 620 (1980). A party's delay is unreasonable if the party "discovers or by the exercise of reasonable diligence cold have discovered the wrong of which he complains." I-291 Why? Ass'n v. Burns, 372 F. Supp. 223, 239 (D. Conn. 1974). Though normally, whether a party's claim is barred by laches is a question for the trier of fact, this is not so where "the subordinate facts found make such a conclusion inevitable as a matter of law." See Papcun, 181 Conn. at 621; see also Kunstsammlungen zu Weimar v. Elicofon, 536 F. Supp. 829, 849-52 (E.D.N.Y. 1981) (holding that summary judgment is proper on the issue of laches when there is no genuine dispute as to the facts supporting the elements). Here, based on the undisputed evidence

before the court, there is no genuine issue of material fact as to Sami's prejudicial and unreasonable delay.

As to the first element of laches, a party's delay in bringing a claim results in prejudice to the opposing party if "it would be inequitable, in light of a change in [a party's] position, to allow [the] claim to proceed or because the delay makes it difficult to garner evidence to vindicate his or her rights." Robins Island Pres. Fund v. Southold Dev. Corp., 959 F.2d 409, 423 (2d Cir. 1992).

Here, Sami did not inform George that he disputed the sums that George alleged Sami received. He held on to the letter providing him with this knowledge for the last 38 years, but did not bring a claim until 2004. Now George cannot prove that, in 1960, for instance, Sami did in fact receive certain sums of money. Given that the parties had a partnership beginning approximately in 1958 -- three decades ago -- and the parties have no evidence of bank records or people with relevant knowledge of such transactions, Sami's delay is prejudicial.

As to the second element of laches, namely unreasonable delay, Sami has had sufficient information for over three decades that would have allowed him to further investigate and bring a claim against George. As soon as December 1970, he could have sought to recover the money that he alleges he never received. Sami, however, chose not to act and waited until now to raise this claim. He is too late. Accordingly, the court grants the

defendants' motion for summary judgment as to Sami's civil theft claim.

III. <u>Misrepresentation/Breach of Fiduciary Duty</u>

Sami claims that, beginning in 1996, he asked George for specific financial information regarding the partnership, but that George refused to provide any such information to him. Rather, he asserts that George merely gave him repeated "assurances" that his "interests were protected," and induced him to rely on these assurances. Sami claims that George's assurances were designed to fraudulently conceal his improper actions, including the transfer of partnership property to the other defendants. These claims are also time-barred.

Both claims of breach of fiduciary duty and misrepresentation are governed by a three-year statute of limitations. <u>See</u> Conn. Gen. Stat. § 52-577; <u>In re Colonial Ltd. P'ship Litig.</u>, 854 F. Supp. 64, 90 (D. Conn. 1994) ("All common law tort claims, including claims for fraud, negligent misrepresentation, and breach of fiduciary duty, are subject to a three-year statute of limitations, which runs from the date of the act or omission complained of.").

With respect to George's assurances throughout the last three and a half decades that the alleged partnership property was being protected, Sami offers no evidence whatsoever in support of this assertion aside from his own affidavit. "A self-serving affidavit which reiterates the conclusory

18

allegations of the complaint in affidavit form is insufficient to preclude summary judgment." <u>Fleet Dev. Ventures, LLC v. Brisker</u>, No. 3:06CV0570 (HBF), 2008 WL 4000611, *2 (D. Conn. Aug. 26, 2008). "The nonmovant, plaintiff, must do more than present evidence that is merely colorable, conclusory, or speculative and must present concrete evidence from which a reasonable juror could return a verdict in [his] favor." <u>Page v. Conn. Dep't of Pub. Safety</u>, 185 F. Supp. 2d 149, 152 (D. Conn. 2002) (citations and internal quotation marks omitted).

Sami's self-serving affidavit is insufficient to support a claim of fraudulent concealment. Indeed, even if Sami had provided the court with evidence of George's alleged assurances, Sami detailed numerous instances where despite such assurances, his mistrust of George was evident. The undisputed evidence shows that the parties' relationship has been acrimonious for many years and Sami has no evidence to show that he had reason to rely on these alleged, oral "assurances." In 1996, Sami accused George of destroying his credibility and character and told George that his actions "[do] not allow forgiveness." That same year, George refused Sami's request for financial information for the partnership. A year later, George sued Sami regarding family property in Lebanon.

As the Second Circuit has explained, when there are "storm warnings" that one is being defrauded, "a duty of inquiry arises." <u>Dodds v. Cigna Sec., Inc.</u>, 12 F.3d 346, 350 (2d Cir.

1993).  Though Sami claims that George reassured him regarding the state of the partnership's assets, "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern."  LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003).  Given the parties' bitter relationship and failure of George to communicate any financial information about the alleged partnership to Sami, Sami should have been on notice that George was no longer acting in his interest.  In addition, Sami performed a title search of the alleged partnership property in 2000, which revealed that ownership of the property was no longer in George's name.  This was a breach of the alleged partnership agreement as Sami understood it, yet he failed to act or inquire further.  If Sami had sought a copy of the alleged partnership's tax returns, he also would have discovered that George had been claiming it as a sole proprietorship since 1970.  Sami had no reason to believe that the partnership assets were being protected.  He therefore should have brought his claims for breach of fiduciary duty and misrepresentation by 2003 at the latest.  Instead, he waited another year.  As such, Sami's claims for breach of fiduciary duty and misrepresentation are time-barred.

IV.  Accounting

Sami alleges that George withheld the partnership's

financial information from him and claims he is entitled to a full accounting. The defendants do not dispute that George failed to provide financial information to Sami after 1996, but counter that an action for an accounting based on that failure is now time-barred.

An accounting is an equitable remedy codified in Connecticut General Statute § 52-401. See Zuch v. Conn. Bank & Trust Co., Inc., 5 Conn. App. 457, 460 (Conn. App. 1985) (citations omitted); Albert v. Alex Brown Mgmt. Serv., Inc., No. Civ. A. 762-N, Civ. A. 763-N, 2005 WL 2130607, *11 (Del. Ch. Aug. 26, 2005) ("An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result."). "The basis for a right to an accounting is supported by an allegation that a fiduciary relationship exists." Zuch, 5 Conn. App. at 460 (citations omitted). "The general rule is that a prior demand by the plaintiff for an accounting and a refusal by the defendant to accounting is a prerequisite to the commencement of an action for an accounting." Id. at 461 (citing 1 Am. Jur. 2d, Accounts and Accounting §§ 46, 47). An action for an accounting is governed by a six-year statute of limitations. See Conn. Gen. Stat. § 52-576.

It is undisputed that George stopped providing the partnership's financial information to Sami in 1996. Sami states that he repeatedly sought the information but George refused to

give it to him. Sami admittedly was not involved in the day-to-day operations of the business in 1996 and George was his sole contact for information regarding the financial health of the partnership. Accordingly, George's refusal to provide financial information to Sami can properly be characterized as wrongful exclusion for the alleged partnership. Pursuant to Conn. Gen. Stat. 34-339(c), "[a] right to an accounting upon a dissolution and winding up does not revive a claim barred by law." Here, based on Sami's allegations that he was wrongfully excluded from the partnership, he should have brought a claim for an accounting separate from a suit for dissolution by 2003 at the latest. See, e.g., Fike v. Ruger, 754 A.2d 254, 256 (Del. 1999) (noting that where plaintiff sought an accounting in part to dispute some loan agreements, "although plaintiffs may now have a right to an accounting in connection with the impending dissolution and winding up of the joint venture, they may not, in connection with that accounting, litigate over the validity of . . . 18-year-old loan agreements"); Bayer v. Bayer, 465 A.2d 900, 904 (N.H. 1983) (holding that in an action to compel an accounting for a partner's wrongful exclusion, the action was barred by the statute of limitations where the wrongful exclusion took place eight years before the action was brought).

Here, Sami waited seven years from George's refusal to provide financial information in 1996 and filed this lawsuit in 2004. Accordingly, the statute of limitations on Sami's claim

22

for an accounting ran sometime in 2003, six years after George refused to provide the information Sami requested.  This does not mean, however, that Sami presently is not entitled to an accounting upon the winding-up and dissolution of the partnership; indeed, should a jury find that a partnership exists and that Sami is entitled to an accounting in conjunction with the dissolution process, such an accounting is proper.  Conn Gen. Stat. § 34-378.  However, a separate claim for an accounting based on George's failure to provide financial information - and indeed, any alleged wrongdoing prior to 1996 - is barred by the statute of limitations.

     V.   <u>Breach of Contract</u>

In his complaint, Sami lists numerous "breaches" of the alleged partnership agreement beginning in approximately 1970. Sami points to the following as evidence of George's breaches of the agreement: 1) refusing to share assets of the partnership; 2) refusing to convey fifty percent of the partnership property; 3) refusing to repay Sami for his investments into the partnership; 4) refusal to repay Sami for his payment of partnership taxes before 1970; 5) refusal to provide an accounting of the partnership; 6) mortgaging the partnership property.

The first four "breaches" that Sami alleges are actually part of the dissolution and winding-up process of any partnership.  Indeed, Conn. Gen. Stat. § 34-374 states that as part of a partnership's winding-up process, the assets of the

partnership may be distributed to the partners.  It also states that the partnership property may be transferred.  Id.  However, Sami's claim that he is entitled to half of the partnership property is without merit.  In Connecticut, a partner's share in the partnership, including real property, is considered personalty.  "The official comment to the Uniform Partnership Act, § 502, and General Statutes § 34-347 both explain that a partner's transferable interest is deemed to be personal property, regardless of the nature of the underlying partnership assets."  Gorelick v. Montanaro, 94 Conn. App. 14, 18 n.11 (2006).  The Uniform Partnership Act, General Statutes § 34-346 states that "[a] partner is not a co-owner of partnership property and has no interest in partnership property which can be transferred, either voluntarily or involuntarily."  See Conn. Gen. Stat. § 34-346.  Also, Conn. Gen. Stat. § 34-347 provides that "[t]he only transferable interest of a partner in the partnership is the partner's share of the profits and losses of the partnership and the partner's right to receive distributions. The interest is personal property."  See Anderson Sunnyside Farm Assocs. v. Frank Verderame Constr., Inc., No. X09CV004034010S, 2008 WL 2096817, *4 (Conn. Super. Ct. Apr. 24, 2008).  Provided that Sami can demonstrate to a jury that a partnership in fact existed after 1970 and that partnership funds were used to purchase the property, he may be entitled to a sum in proportion to his share of the property, but not to the property itself.

Next, Sami alleges that he repeatedly asked George for the financial information of the partnership. It is undisputed that George refused to provide any financial information to Sami after 1996. As discussed in the previous section, the six-year statute of limitations on an accounting begins to run when a partner is excluded from the partnership. See Fike, 754 A.2d at 256; Bayer, 465 A.2d at 904. Accordingly, Sami's allegation that George failed to provide an accounting of the partnership business is time-barred.

Sami also alleges that every time George mortgaged the alleged partnership property, he breached the partnership agreement. It is undisputed that Sami was aware of the purchases of all of the properties at the time that they occurred. After he conducted a title search in 2000, he also knew that the property was mortgaged. Sami now calls such breaches "minor" and not grounds for dissolution. Accordingly, the court will not consider George's mortgaging the property as a basis for Sami's breach of contract claim.

Finally, Sami argues that George's 2001 letter in response to Sami's demand to dissolve the partnership constitutes grounds for a breach of contract claim. At that time, Sami had already decided that he wished to dissolve the alleged partnership. Indeed, because there was no written partnership agreement that set forth events that would precipitate dissolution, pursuant to Conn. Gen. Stat. 34-372, in a partnership at will, the

25

partnership is dissolved when the partnership has notice that from a partner "of that partner's express will to withdraw as a partner," or the partnership can also be dissolved "[o]n application by a partner [for] a judicial determination that: (A) The economic purpose of the partnership is likely to be unreasonably frustrated; (B) another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or (C) it is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement."  Because George resisted the dissolution of the alleged partnership, Sami was then able to avail himself of the section of the statute seeking a judicial determination of dissolution.  George's letter does not constitute a breach of the alleged agreement - admittedly, at that time, Sami no longer desired that the parties be bound by an agreement at all.  At best, George's letter could constitute "conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner."  See Conn. Gen. Stat. § 34-372 (5).

In addition, Sami states that "[t]he Complaint, with only a couple of exceptions, is predicated solely on determining whether a partnership existed and if so, to what is the Plaintiff entitled."  Sami further states that all of the relief he seeks in relation to his breach of contract claim "is predicated on the

26

'winding-up' of the partnership." The court agrees. The substance of Sami's complaint seeks simply a winding-up and dissolution of the alleged partnership and he has failed to prove that he has any other claims for breach of contract that would not be time-barred. Accordingly, the court grants the defendants' motion for summary judgment as to Sami's breach of contract claim.

## VI. Unjust Enrichment

In support of his unjust enrichment claim, Sami states that he is entitled to a distribution of partnership assets and funds. According to RUPA, Sami is not entitled to a distribution of any of the alleged partnership's assets or funds until dissolution, unless he proves that George breached the partnership. See Conn. Gen. Stat. § 34-339(a). As discussed above, all of the alleged "breaches" took place years ago and are no longer actionable under either a theory of laches or the statute of limitations.

## VII. Liquidation/Dissolution

Sami seeks the winding-up and dissolution of the alleged partnership. The term "partnership" means an association of two or more persons to carry on a business enterprise as co-owners for profit. Conn. Gen. Stat. § 34-301(5). A "partnership at will" is defined as "a partnership in which the partners have not agreed to remain partners until the expiration of a definite term or particular undertaking. . . . Under Connecticut law, a partnership at will can be dissolved by any partner at any time."

27

<u>Bowerman v. Oakliff</u>, No. CV010094089, 2003 WL 22413516 (Conn. Super. Oct. 07, 2003)(citing Conn. Gen. Stat. § 34-301(7)). Whether a partnership exists is a question of fact for the jury to decide.  <u>See</u> <u>Lenoble v. Best Temps, Inc.</u>, 352 F. Supp. 2d 237, 250 (D. Conn. 2005).  Should a jury determine that a partnership existed after 1970 and if so, the parameters of the partnership, the court will consider how the partnership should properly be dissolved in accordance with Connecticut law.  Accordingly, the court declines to grant summary judgment on this claim.

<u>CONCLUSION</u>

For the foregoing reasons, the defendants' motion for summary judgment [doc. # 164] is GRANTED IN PART and DENIED IN PART.  Summary judgment is granted as to all of Sami's claims except for dissolution and winding-up of the alleged partnership.

SO ORDERED this 10th day of October 2008, at Bridgeport, Connecticut.

/s/_____
Alan H. Nevas
United States District Judge
